Case number 14-1249, Sierra Club Petitioner v. Federal Energy Regulatory Commission. Mr. Matthews for the Petitioner, Mr. Solomon for the Respondent, and Mr. Franklin for the Intervener. Good morning. Good morning. May I please record Nathan Matthews on behalf of Petitioner Sierra Club. I'd like to reserve five minutes for rebuttal. The case before the Court today concerned FERC's orders authorizing construction and increased operation of facilities that will enable the export of a large percentage of the natural gas produced in the United States. The gas exported by these facilities will have to come from somewhere. FERC admits in its response brief that the exports enabled by these facilities will lead to a foreseeable increase in gas production. The record indicates that exports will also displace some existing gas demand primarily by the electric sector switching from gas to coal power. These increases in gas production and coal use will have important environmental consequences. In particular, they will lead to an increase in greenhouse gas emissions and an increase in emissions of ozone-forming pollution. My question for you is why is this action directed at FERC? Why isn't it directed at the Department of Energy? I mean, we learned from a public citizen that we're supposed to look to the agency that has statutory authority over the cause. The cause here is increased exports of natural gas. That's a decision that belongs to the Department of Energy and not to FERC. So why under a public citizen, why aren't you going after Department of Energy instead of the little guy here? Before addressing that, I have a two-part answer to the question about public citizen. The first is that under NEPA, the norm rather than the exception for multiple agencies to have authority over a particular effect. That's especially true for growth-inducing effects which are explicitly called out in the NEPA regulations as an effect that needs to be within the scope of the action review. Let's go back to public citizen. Public citizen says we look to the agency that has the statutory authority that has the ability to prevent the cause. The cause here is increased exports. FERC isn't the problem here. The Department of Energy, according to your view, the Department of Energy is the problem. FERC is just a little player executing the Department of Energy's policy. I disagree with the idea that FERC is a small player. I think the reason for that is that public citizen is right on. I actually didn't think about that too much before I said it. FERC is a little guy. But you see, they play a function here where the real decision, the authority lies with the Department of Energy, at least as I read – the type of authority we're supposed to look at, at least as I read public citizen. Help me. Of course. I will try. Public citizen turned on a statutory framework, which is starkly different from the statutory framework provided by the Natural Gas Act here. The decision of public citizen turned on the fact that the Department of Transportation had no authority or no ability to prevent the effective issue. The entry of Mexican trucks into the United States did depend upon the Department of Transportation issuing the rules at issue. But because the statutory scheme still cabins the Department of Transportation's discretion, there was no ability for the Department of Transportation to refrain from issuing the regulations at issue. In contrast to that sharply delimited discretion in public citizen, the Natural Gas Act provision at issue here is the public interest determination under Section 3, which is a broad statutory inquiry. This court and the Supreme Court have held that that inquiry specifically concerns effects on natural gas supply. It's one of the purposes that needs to be considered in execution or in resolution of that public interest determination, and as well as effects on the environment. So the statutory provision here is much broader and certainly encompasses the types of effects on gas supply and on the environment that are at issue here. So the focus of the EF Act in that connection following up on Judge Griffith's point, the focus is under the Natural Gas Act, the impact of letting this increase be authorized. I agree that the first part of the public citizen inquiry is the court and public citizen stated that the scope of NEPA inquiry was informed by the policies and attempts underlying the statutes at issue, and here the statute at issue, the Natural Gas Act, clearly encompasses... No, what I'm trying to focus on is the Natural Gas Act is not another EPA statute. All right, that's one realm of responsibility. It's also not a Department of Energy statute. It's focusing on what FERC does, and what FERC is arguing here is the siting and the operation of this facility. I'm not sure that I answered the question, but let me... Your response to Judge Griffith is the Natural Gas Act talks about environmental effects. It talks about public interest, and my follow-up is to suggest that maybe under the statutory scheme as envisioned by Congress, there are separate responsibilities, and just because the word environment and the word public interest appears in the statute doesn't necessarily mean that the agency implementing that statute has the same breadth of responsibility as other agencies in particular areas. Indeed, in this case, Congress said this was a matter for the Department of Energy, and Energy delegated limited authority to FERC. I have two responses to that question. The first is that although the Department of Energy delegated authority to FERC to undertake the public interest inquiry for purposes of siting, construction, and operation of natural gas export facilities, there is no clear language in that delegation order or in any other Department of Energy statement that would plainly limit the scope of FERC's inquiries or to limit the scope of NEPA inquiry that would otherwise be required. So the agency has adopted an interpretation, and what is your burden with regard to convincing us that it has adopted an impermissible interpretation? Our burden is under the arbitrary and capricious standard of review here. We would argue that the Natural Gas Act identifies certain factors as factors that the agency must consider in execution of the Section 3 public interest inquiry, that impacts on gas supply and the environment are among those impacts, and that FERC, by refusing to consider impacts on gas supply and on the environment here, failed to consider an important part of the problem, and so that FERC's decision violates. As I understand what NEPA is trying to do here, and again, in light of public citizen, maybe I'm just repeating myself, in public citizen, we're supposed to look at the agency that has authority over the conduct that is causing the problem. The statutory authority for FERC here is siting, to pick the site, to operate, and produce, and that's not the problem. The problem here, according to your view of things, I think, is the Department of Energy, who has the statutory authority to determine, turn this thing on, let's send it all overseas. And that's what's causing the problems, in your view, isn't it? So again, the question is, why don't you go after them? One reason why we are concerned with FERC's authorization, as well as the Department of Energy's actions, is that because FERC, under the division of labor that FERC and the Department of Energy has adopted, because FERC goes first and authorizes construction of these facilities, significant investment and commitment of resources ahead of time, FERC, in essence, allows a thumb on the scale for the subsequent Department of Energy decision-making. And that, again, under NEPA, overlapping agency authority is the norm rather than the exception. So it's just because it's the way it functions, the way the statute functions in the real world, you're saying. FERC is making the first determination you want to cut it off at the pass, right? Is that sort of it? In essence, yes. But I don't know that public citizen allows us to take a functional view of this. I mean, the statutory authority is clearly the Department of Energy, and it's not with FERC. And as I read public citizen, we're not supposed to conduct this sort of functional analysis. We're supposed to look at where the statutory authority lies for the conduct that's causing the alleged harm. And so our concern is that the scheme that is played out here is that the Natural Gas Act provides a single public interest standard. It does not provide separate standards for construction of export facilities and then a different statutory inquiry for the decision whether to authorize exports to occur. There's a single public interest standard in Section 3 of the Natural Gas Act. Isn't it more than that? I mean, where is the statutory authority to approve construction? With DOE or FERC? The statutory authority. The statutory – so the Natural Gas Act Section 3 authority was vested in the Federal Power Commission and then separately transferred to the Department of Energy. That's right. That's what the statutory authority is. There's no particular statutory provision transferring authority over site and construction or operation of natural gas export facilities to FERC. Exactly. That was done as a delegation by DOE. So for purposes of public citizen, is it not DOE that has the statutory authority for both segments of the decision-making process here, the construction and the export decision? I'm not sure why you're buying into the public citizen paradigm here because there's one agency and FERC is just its agent, its magistrate judge making a report and recommendation, essentially. I believe I agree. Again, I think the public citizen was focused on the scope of factors that Congress intended an agency to consider. The Department of Energy has authority under a separate statute to delegate decision-making to FERC, but in this process of so doing, the Department of Energy doesn't have authority to allow FERC to make decisions without considering the full scope of factors that Congress intended to be considered. I guess I'm asking what happens when a delegation is made? Does that mean that DOE is – the energy is still not statutorily responsible for the decision-making issues? I mean, I would assume they were still statutorily responsible for the decision-making issues just like when any other federal agent delegates power to someone else. There's still – the buck stops with the person that Congress designated in the statute. My understanding is that because the Department of Energy has statutory – a specific statutory opposition to delegate some of its authority to FERC, that the buck stops with FERC for purposes of the site and construction and operation inquiry, but that although the Department of Energy can transfer the authority and responsibility to FERC, the Department of Energy can't do so in a way that allows decisions to be made without considering the full scope of issues that Congress intended. What happens if it's – if the gas is going to be exported to a country with which there is a free trade agreement, not a non-free trade, but where there is, where it's – I take it it's automatic under the statute, automatic approval, if it's a free trade country. Is that correct? That's correct. That's correct. And so if FERC authorizes construction and then the gas is authorized by DOE for export to a free trade country, when would – where would one ever have the opportunity to challenge, make those export arguments that FERC is saying you need to level with DOE rather than with FERC? Is there any opportunity administratively to then raise the arguments that FERC wants us to raise with DOE? I believe that there is still some opportunity, and I would first point out that in the cases at issue here, there's no indication that these facilities would proceed with exports to free trade agreement countries, both in slot, non-free trade agreement countries. But there have also been free trade authorizations. But the facilities have entered contracts in the record where they expect – where they have – the record indicates that they intend to export to non-free trade countries. I've got to figure out how – I've got to figure that some of the time these things are being built for gas to go to free trade countries. And so if we have this bifurcated approach where you only talk about construction with FERC and you're supposed to raise the NEPA concerns about the impact of the exports, the spigot turning on the Department of Energy, how does that work when it's a free trade country and there is no opportunity? It's automatic. Congress has already said there will be no – you know, go directly to DOE, right? That's public citizen. In that case, there may be – we may have a public citizen problem where there's no authority to act and no authority to deny the exports. I'm sorry. So – But – Right. So then the factors that you say NEPA requires to be considered just aren't to be considered at all when it's a free trade, but it is supposed to be considered when it's a non-free trade? That doesn't make a lot of sense to me. I think part of the difficulty is that, again, there is only a single public interest standard in the Natural Gas Act. And the provisions of the Natural Gas Act that address exports to free trade agreement countries simply refer to the public interest standard. And because the statute does not break out public interest separately for different types of authorizations, the statute does not explicitly speak to this question. Insofar as FERC has authority over the siting of projects in addition to its other issues, I think FERC has agreed in the record that the siting of projects can influence where the gas supply in the project is likely to come from, that a project located on the Oregon coast, for example, is not likely to increase gas production in the same areas that a project located on the Gulf Coast would. So there is still an aspect of the indirect effects that is influenced purely by the FERC decision of where to locate the project separate from the decision of whether to export at all. And that decision would still need to be made even for exports to free trade agreement countries. All right. Can you just quickly address standing in this case? In the sitting case? Yes. Show me where in your two declarations you think someone has identified injury traceable to this incremental increase in capacity. Of course. CRC member John Paul testified that he fishes boats and hunts in the areas near the sinking pass facility and that his enjoyment of those activities would be adversely affected by an increase in vessel traffic. Right, but there's no vessel traffic. There's a summary judgment level showing in the record, unrebutted from view, is that there is not evidence of an increase in vessel traffic as a result of the capacity increase, not from the exporting of the train operations, just from the capacity increase. We attempted to show in the record that by increasing the amount of gas processed and exported from the facility by 25 percent, which the increase in output specifically authorized by FERC, moving more gas requires more boats. And so a 25 percent increase in output would be expected to correlate with a 25 percent increase in vessel traffic. FERC made a specific finding that there would be no increase in traffic, attributable just to the capacity increase, as opposed to the train authorizations, the other things that are going on in this area. And how did you rebut that? We rebutted that by showing that FERC mischaracterizes its own record. What the FERC authorization and we're hearing denial show is that FERC concluded that there would be no, that vessel traffic resulting from the increase would not exceed the 400 ships per year that FERC previously determined would result from imports of a vastly greater amount of gas. But FERC never quantified the number of vessels that would be required for the 2.2 billion cubic feet per day authorized in 2012 relative to the 2.75 billion cubic feet per day authorized in 2014, nor has FERC identified any mechanism by which you could increase the volume of gas exported without requiring additional ship traffic. And how did you say his behavior had changed because of this? I know he said he relocated his boat, but he said that was a decision made in addition to owning property at the other location. And it had a lot of things that sounded like an increase in traffic. Yeah, so it's an aesthetic and recreational injury that he will suffer because of diminished enjoyment of the fishing, hunting, and boating that he continues to do in the area. I just enjoy it. I keep doing it. My behavior hasn't changed. I just enjoy it. Someone like Kathy when I'm out there counts as Article III injury? Under this course of precedence, we condemn it as of. Just that my behavior has not changed, just my marginal happiness? Yes. In which case? That that provides an injury under Article III. In which case? Do you think it's just the marginal less happy? You can check that. I'm sorry. I won't get that when we get to it. Yeah, and you might check the animal zoo case. But in any event, let's hear from the Commissioner. May it please the Court, Robert Solomon for the Commission. I think I'll start with the statutory and delegation scheme and then I'll proceed to Judge Millett's questions concerning standing. Your honors are correct to start with the statute itself, Section III of the Natural Gas Act, which is 15 U.S.C. 717B. Now, the language of that provision speaks just to the Commission, but it's important to also bring into account the Department of Energy Organization Act of 1977, which is found in 42 U.S.C. 7151, as it pertains to the new Department of Energy, and 7171 and 7172, as it pertains to the brand new Federal Energy Regulatory Commission. Prior to 1977, when there was no Department of Energy, from the 1938 passage of the Natural Gas Act to 1977, the only federal actor which is assessing the public interest is the After 1977, under 42 U.S.C. 7151B, the powers of the Federal Power Commission were transferred to the new Department of Energy. In 42 U.S.C. 7172A, various authorities were transferred back from the Department of Energy to the new FERC, but that authority did not include Section 3 of the Natural Gas Act, 717B of Title 15. Under 42 U.S.C. 7172E, however, the DOE Secretary may assign to the Commission any matters it chooses, and under the delegations of the DOE Secretary that the FERC only the authority over the facilities at the import and export sites. So your honors are... Is there anyone for Sierra Club to sue on this if it can't be FERC? Can they go against the Department of Energy? Of course they can go against the Department of Energy. The Department of Energy, of course, authorizes the import or the exports of the commodity itself. The Department of Energy has not yet acted with finality with respect to Freeport or Sabine, but there are provisions under the federal... I thought it was the view of the Department of Energy that they need not conduct a NEPA analysis if there was no construction or modification of the existing facility. That is correct. With respect to Sabine, the FERC did not authorize any new construction, any new additional... So there's no NEPA challenge that can be brought there? I mean, if a result of the decision to authorize Sabine to increase its exports has adverse environmental impacts, where's the relief? Well, that goes to DOE regulations concerning a categorical exemption under its NEPA regulations for projects where there's no new construction. How would that work here? How would that work here? The DOE is not a cooperating agency with respect to Sabine Pass as it is in the environmental assessment or environmental impact statement. However, the Department of Energy still has to independently assess the environmental findings and conclusions of the FERC at the time it makes its import or export authorization. I cannot cite to you any... So what sort of challenge would a petitioner like Sierra Club launch? Just an arbitrary and capricious challenge? Or there's no NEPA study that's conducted? So how would they get at a decision by the Department of Energy in Sabine Pass? Well, again, at this point, there's nothing in the record because the DOE hasn't yet passed on... No, he's trying to understand how the statute works here. Well, under the statute, under a provision that was added in the 2005 Energy Policy Act as it amends the Natural Gas Act, there is a provision for judicial review under 15 U.S.C. 717R which provides for, under subsection D, which provides for judicial review of actions by federal or state citing agencies other than the Federal Energy Regulatory Commission. Even at the time DOE makes its final authorization as to the import or export, there can be a challenge to DOE's assessment of the FERC's environmental document and environmental findings. So DOE decided it was going to delegate a part of its work to FERC. So FERC had to make some decisions about what that would encompass. And FERC decided it could meet any NEPA obligations with respect to an environmental assessment. Yes. So that goes back to the Department of Energy. And is energy, just hypothetically, going to go back to square one and allow challenges? No. The Department of Energy would not go back to square one. That's particularly the case with respect to the 2014 authorizations in this particular case. With respect to... No, let's just stick to what's before us. Okay. So I want to be clear that if FERC has made certain decisions about what it thinks its appropriate role is here, are you suggesting that those decisions are not subject to challenge, much less judicially reviewable at this stage of the proceeding? Well, putting aside the standing concern that I'll get to in a moment, when we have the type of proceeding that we have here, which does not involve any new construction and does not involve any additional shipping traffic or any additional upstream natural gas capacity, yes, there are limitations on what can be challenged in light of the fact that no construction whatsoever has been authorized in this proceeding. Here's how I've been trying to understand this case, and the analogy may be poor. The original authorization was to construct a building that allowed 15 dwelling units. However, the owner decided it only wanted to use 10 of those units, and that was what the original authorization was for, the use of 10 of those units, even though the construction of the building itself was able to handle additional tenants. Then the owner comes back and says, no, we figured out a way that he can get two more tenants in there. Now we're at the point where the owner wants to have 15 tenants in the building, and at least according to my reading of the record, this will involve an increase of 1,012 billion cubic feet per day being exported. So just stick with my analogy for a moment. With three new tenants, there's going to be additional water usage, sewer needs, traffic, tenants in and out of the building, that sort of thing. So that's what FERC is looking at, and as I understand what the petitioners are arguing, is that traffic, A, could be the tip. I don't have a good analogy here, but the straw that breaks the camel's back. That's number one, and you say, no, no, no, no, we're not going back to square one, they acknowledge, they're not challenging the 2012 authorization, but they say there is this 1,000 billion cubic feet that's being authorized. So no new construction, but there's new activity, and the activity is, in their view, going to produce these negative impacts on the environment, and they want the agency, and they say that the agency is obligated under NEPA to address that. Your Honor, the commission did address that. They say that because these three new tenants are in this facility, it may not be the straw that breaks the camel's back, but it's significant, and therefore, the agency can't simply stop at the narrow EA. It has to go beyond and see whether this additional 1,000 billion cubic feet is going to have indirect or cumulative impact. Isn't that their argument? Yes, that is their argument. Isn't it a 25% increase? It's a significant increase. Well, there are several points here. One, yes, the agency does have a responsibility to consider additional activity, but using the 15 and 10 hypothetical that Your Honor provided in the earlier 2012 proceeding, the agency took into account the 15, not just simply the 10 or the 13. So it's modeling anticipated. I'm putting words in your mouth, but tell me if I'm wrong. It's modeling anticipated that there could be 15 occupants. Exactly, Your Honor. In the 2012 proceeding, the commission modeled traffic operations, the missions of the Sabine facility as if it were operating 24 hours a day, 365 days a year, the most aggressive form of modeling it could. Sabine Pass came back to the agency and said, well, it won't be operating 24-7, 365, under the very conservative assumptions that it provided to the agency earlier, but it is possible under the design as originally planned and with respect to certain design changes that the commission approved in 2013, that it can squeeze out additional efficiencies. I have to correct Petitioner's Counsel. The 25% increase is only on the best day of the year under optimal operating conditions. You cannot extrapolate 25% increase for the entire year. The annual increase in operating efficiencies won't be 25%. It might be 1%. It might be 5%. The commission found that the- I think you first said it could at least go up to like 18 MTPA, even if not all the way up to 20 MTPA. And so I don't think they dispute that there's going to be a material increase in the amount here. That's why we're all here. So maybe they're wrong on 25%, but, you know, 12%, 15%. Well, we're not contemplating any additional shipping traffic at the facility. Indeed, the agency did not authorize any expansion. Away from shipping, I want to get back to your point. You said it's not 25%, but so let's assume it's 10% to 15%. That is, as far as I know, 18 for Petitioner, but that's what they were contemplating. So we still have two more people or one more people cramped into the apartment. Would that be increased? Well, that's correct. I wanted to differentiate between the shipping traffic and the operational activity. The commission anticipates a 0% increase with respect to shipping traffic. With respect to operating activity, yes, it's possible that the facility might run 1%, 5% longer, and the additional design changes that allow for the refrigeration compressors to operate more efficiently when ambient air temperatures are higher. Yes, there could be, and with additional maintenance programs at the facility, it is possible that the facility might operate a little bit harder, a little bit longer. I'm sorry. It's possible that there is going to be increased gas production with increased capacity. We can talk about whether it's 25% or 10% or 15% or 5%, but there's going to be increased capacity, and the whole reason they authorize that is they expect to use some of that increased capacity. So the question is, if there's increased capacity, that gas has to come from somewhere, and so shouldn't at least the cost of getting that extra gas and the consequences of it be factored into NEPA? Yes, those consequences should be factored into NEPA, and the commission factored those consequences into NEPA back in the 2012 proceeding. We contemplated that the facility would not be down for maintenance. We contemplated that the facility would run as hard and as efficiently as Sabine Past now posits in its 2013 application for the additional authorization. So we believe under NEPA, while there is possibly, under optimal operating conditions, some incremental activity at the site, the agency's responsibility is to consider environmental consequences at the site, which the agency did in the 2012 proceeding. So with respect to your theory that the purpose of what FERC is doing, the NEPA analysis, should just look at the consequences of the construction, or in this case, an authorized increase in capacity, but not the ultimate decision whether extra gas will be exported, that's for DOE. So when DOE makes an authorization for a free trade country, a country that has a free trade agreement, I take it there's just no NEPA analysis of the export impact that you're talking about at all. Is it your understanding of what Congress did with its automatic authorization, that NEPA just doesn't apply, or is NEPA supposed to apply up front at this stage, whether it's construction or capacity decisions? No, NEPA would still apply. Your Honor is correct that there is a statutory provision that applies specifically for exports to free trade agreements, and in those circumstances, the Department of Energy shall authorize that export. My understanding of the Department of Energy, and I've received four questions about what the Department of Energy is doing or will doing than what the FERC actually did in this case. Your theory seems to be this only look at VIVA with respect to what FERC is doing and save those other concerns you have for the DOE decision making. But if there are DOEs, if you can't raise it with DOE because it's a free trade country or, as in this case, there's no construction or modification happening, then your theory doesn't work. And so what do we do? Well, regardless of whether the export to or import from is to or from a free trade agreement or not, for purposes of that export or import, there has to be construction and operation of the facilities at the export import site, and the Federal Energy Regulatory is the lead agency with respect to the environmental review. Typically there are cooperating agencies, including the Department of Energy. I think I heard you, the fact that you're the lead agency and the fact that at least in those two scenarios there's no chance for further deep analysis by DOE, then as the lead it has to be done when you do it. In your NEPA analysis you have to include not just construction impacts, but the impacts of the export itself. Do you not? Because otherwise there's nowhere, really, I don't know where the claim is made otherwise. We do our NEPA analysis of the facilities. So we have limited statutory and delegated authority, and when it comes to the- The answer to that, when it's a free trade country or when there is no construction or modification, it's just increased capacity like this case, there is no place to raise the concerns about the impact of the export decision-making. Is that true? There's no place to raise it. Well, I believe the Department of Energy does issue orders with respect to the export, both to a free trade agreement and with respect to the non-free trade agreement. I don't think DOE could say, I know, Congress, you said automatically authorize it to the free trade country, but I'm actually stopping here. I'm doing a NEPA analysis, and I don't think I should authorize it. Well, with respect to the NEPA analysis, even when there is no additional construction of the type that we have here in the Sabine Pass case, there still is the opportunity for judicial review of the environmental analysis of the facilities themselves on review of the FERC order, which is exactly what we have here. Even though there was no additional construction. I just want to back this up. Assume this case involved the increase in capacity was going to allow for increased gas exporting to a free trade country. Just assume that. Where would the NEPA analysis of the environmental consequences of the decision to export be made? With respect to the export, it would have to be made in the context of the Department of Energy order. The automatic order where they say it's a free trade country, nothing we can do about it. That is my understanding, because the FERC's responsibility is with respect to the FERC. The DOE does have an independent responsibility to make its own findings and conclusions based upon the environmental assessment or the environmental impact statement. Not in a free trade country case, does it? What does that legal challenge look like? Congress said it will be automatically done. Here we did it. Even with respect to the NEPA analysis of the facilities that's handled by the FERC, if there's a concern with respect to the environmental aspects of the export, if the FERC is responsible only for the facilities and Congress has decided that the export shall be Does that mean Trump's NEPA, then? In that instance, you're saying Congress has decided in these free trade agreements that NEPA just is not obtained. That must be the answer. I'd like to ask you some questions about foreseeability. But, yes, I do want to say that is a decision that Congress would have made in 15 U.S.C. 717dc with respect to the shall approve with respect to free trade agreements. This shall come into the country. You're relying on public citizens. So there is no NEPA analysis beyond the type of EA that FERC has done here under this scheme, at least as to the free trade countries. That is correct. The environmental analysis is done at the FERC level. And so the only protection of the public is, A, get Congress to change its mind. The only protection to the public, then, is to get Congress to do something or to get EPA to issue some new regulations controlling the emissions. You're smiling, but I'm trying to understand what NEPA Isn't this just undercutting the whole point of NEPA if nobody can raise these questions before DOE or FERC to which DOE has delegated this responsibility? I would say that's a decision that Congress has made with respect to exports to free trade agreements countries. The Commission is trying to faithfully administer its responsibilities under the Natural Gas Act. Here's my question. Suppose that what you say is totally true, but FERC has options before it. For example, if we were where we are in the second case, Freeport, where these facilities should be cited. FERC, if it had all this information about indirect impacts, cumulative impacts, could it not decide that this facility should not be cited at one site but should be cited at another site where it would have less direct negative environmental effects, or that it would have to add conditions to its approval to mitigate further if it understood what the full effect was to be, since this is the only point at which the NEPA analysis comes into play? I think that is correct. Both the Subsection A and Subsection E of Section 3 of the Natural Gas Act, 15 U.S.C. 717B, does speak in terms of reasonable terms and conditions and modifications that the FERC can employ and which it does employ in all of these cases. Well, that is not my question, because statute clearly authorizes FERC to impose conditions, but my question is, what is the basis of knowledge on which FERC is obligated to consider what conditions would be appropriate? Well, I don't want to start talking about the Freeport case, but as that case demonstrates, the agency does have the ability to look into the particular location placement of facilities. There was considerable attention devoted to the pre-treatment center, which is two and a half miles away. Its route was changed. But with respect to the statute itself, while there is nothing that has been delegated by Congress or DOE to the export, I guess that could be accounted for the broader public interest assessment that the agency makes. I do want to point out the specific language, though, that Congress has used in Section 3. It's that the commission shall authorize unless it is demonstrated that the project is not consistent with the public interest. This is quite a stark contrast with the agency's traditional citing authority under Section 7 of the Natural Gas Act, 15 U.S.C. 717F, which is that the commission shall authorize if consistent with the public convenience and the necessity. So Congress has placed its thumb on the scales with respect to FERC authorizations under Section 3. The question is, what opportunity is there to meet that burden? I have a couple of questions about foreseeability, if I might, Mr. Solomon. So why can't FERC predict where the – they're called shale plays. Why can't you predict where they are? Aren't there models that do just that? There are models, but they wouldn't provide any meaningful, useful information to the agency, and I might have to leech a bit into the Freeport discussion because, again, in Sabine Pass, there wasn't any such construction or shipping authorized. But the commission is looking for some type of causal relationship between the facility itself, which is the focus of the congressional delegation and the DOE delegation, and reasonably foreseeable impacts. So all the Sierra Club has provided is – But if you know you're going to increase capacity to export, and you know that the lion's share of these exports are going to come from domestic production, right, why is it – I mean, and FERC's saying this isn't foreseeable because we don't know which shale play is going to be the source of this. But you do know that there's going to be more methane and more ozone in the atmosphere as a result of this activity. And I don't know much about chemistry or physics, but the briefs say that in case of those two pollutants, you know, that's national. That's regional. It's not just located at the site of the terminal. Why isn't that a fair inquiry to make when you know that there's going to be more ozone, there's going to be more methane gas as a result of this activity? Well, the commission is not denying that there very well may be an effect, or there might even be a positive relationship between the siting of export terminals and the development of natural gas in the United States. If I can go back to the public citizen case that we started with, what the Supreme Court requires is a reasonably close causal relationship between the agency action and the upstream environmental impact. This is not like the leading case that Petitioner cites, the Eighth Circuit mid-savings case, where it could not have been more reasonably foreseeable that a railroad from coal mines to coal-burning power plants necessarily and logically will induce additional coal consumption and coal burning. But isn't it eminently reasonable to think that if you're increasing the amount of gas being exported in this country, that you're going to increase the amount of gas being produced? There are many factors. There may be a causal relationship, but with respect to induced natural gas production, by far the leading contributing factors to that decision will be global market demand and prices, technological breakthroughs of the type that we saw in the last 10 years, and environmental policy and regulations. I've got to assume these companies aren't dumping billions of dollars or millions and billions of dollars into building these things without having given some thought to the fact that we're going to have to get this gas. If we build it, the gas will come. That's correct. That's completely reasonably foreseeable, that we build it, the gas will come, and so why can't an estimate about... Well, I have a couple of answers for that. One, all we know is that gas will come and gas will go. These facilities are now bidirectional facilities. Ten years ago, they put all their eggs in the import basket. Now they're adding liquefaction capabilities so that they can export as well as import. What we know is over the next couple of decades, gas will be coming and going. We know how volatile and unpredictable markets are for liquefied natural gas because we have the history of... I know we have things change over decades, but NEPA doesn't require you to have a perfect crystal ball. It just says, look, they want to export, and they want to even export a bit more now by increasing capacity. They want to export, and so we're going to look at this picture in time now and see what the environmental consequences are of exporting. It doesn't mean that things won't change in five or ten years, but everyone can always get out of NEPA by saying things could change next decade. That is correct, and the agency does a comprehensive review of all of the environmental effects concerning the facilities that are... The facilities, but not the gas, that if you build it, gas will come. That's very reasonably foreseeable in time to the building. That's the whole reason it's being built. They have the import. No, anything that is reasonably foreseeable, the agency took into account in both the Freeport and the Sabine cases. The commission did not just simply take into account air, water, and public safety, but the agency also did not distinguish between effects that were direct and indirect, but I do note that the agency took into account all socioeconomic factors that are induced by the facilities or the authorizations in place, and we looked at jobs and housing and roads and schools and property values, those types of indirect effects that are implicated by the decisions presented by the parties. I do want to bring up what I view to be... Let me be clear. Your argument, in effect, is this is a collateral attack on what happened in 2012. Well, it depends upon what petitioner is arguing. No, I know. I'm talking about what you just argued. Right. To the extent they did not take advantage of the opportunity to appeal the 2012 orders, to the extent that Sierra Club is arguing not about the additional incremental capacity of the facilities, but rather the as-authorized capabilities of the facilities in 2012. No, no, no. I just need to be clear what the agency's position is. Your answer to Judge Millett is that we did all this in 2012. We considered full capacity in 2012. Yes. So it's too late now to raise all these objections. Yes, we do believe that to the extent they're arguing that we aired in our modeling both of the original 2.2 billion cubic feet a day and the authorization to up that on the very best day to 2.76 billion cubic feet, those are decisions and models that we undertook and made in the orders two years previously. What is your answer to the question, the owner subsequently determined that some adjustments could be made so it could produce another 1,000 billion cubic feet per day. So that was not considered in 2012. That is correct. The incremental authorization is based upon the engineering plans and designs as they were earlier presented to the agency in the 2012 proceeding and also some design modifications that were presented to the agency in a 2013 proceeding. By the time you get to the 2014 proceeding, the order is on review. Now all of the effects have already been modeled and taken into account in the earlier proceedings. How can that be when the justification is that, in a nutshell, the operators figured out a way to be more efficient and produce more? Because the assumptions in the earlier 2012 proceeding were very conservative assumptions. It was based on average annual production capabilities. My understanding is that being passed is the first of the applicants for export authorization. It's probably the first or among the first to actually start designing and constructing these facilities. And it makes sense in the earliest of the proceedings that the assumptions at the pre-design, pre-construction stage might not necessarily match the reality of the design and the construction stage. I do want to talk briefly about standing. And our standing argument is based on the fact, as we have discussed, that nothing new has been authorized. The much more consequential decisions were made by the agency in the 2012 proceeding. Those orders were not challenged. And in this year's 2015 proceedings, as to the additional trains 5 and 6, also which Sierra Club has chosen not to appeal. With respect to the 2014 authorization, we're just simply making a classic injury in fact argument that any harm that they believe they have suffered is not definitive and concrete and is no different than that which was modeled in the earlier proceedings. With respect to the two declarations of Mr. Paul and Ms. Isles, we're looking for a declarant who lives, works, or recreates near the project site for purposes of standing. Sierra Club seems to have conceded that Ms. Isles does not live or recreate near. With respect to Mr. Paul, it was difficult to tell with respect to the phrasing in the declarations whether these are current impacts that Mr. Paul was currently facing. He used the present tense. Yes, and we will concede, especially based upon the reply brief, that the present tense means that Mr. Paul does hunt boat or fish at the project site now, but that does not relieve the petitioner of the obligation to show immediate definitive concrete injury, which it cannot show based upon the nature of the 2014 authorization. Because you say there will be no increased traffic on the river, is that right? Yes, we are saying there will be no increased traffic. Even though there's going to be an increase in exports, okay. Well, that's not necessarily so odd. It depends upon whether the up to 400 ships were fully utilized. It depends upon the dates in the year under which those passages shall be made. And the commission did not authorize any additional upstream natural gas capacity to bring natural gas to the facility, so it shouldn't be assumed that any more necessarily, any additional takeaway capacity will be needed as well. But he also said there's going to be increased flaring and additional air and noise pollution. Yes, and I was trying to differentiate between the shipping traffic and the operational activity. Right, so I'd like to answer the operational injuries then. He seems to be asserting also the operational injuries. Air, noise, and flaring. It remains speculative, but, yes, it's much more likely that there will be some additional operational activity, and our argument is based upon the fact that that activity has already been modeled and taken into account in the earlier orders. All right, thank you. Let's hear from the intervener. Thank you, Your Honor. It's Jonathan Franklin. Excuse me, I have a bit of a cold today. Thank you, Your Honor. Jonathan Franklin representing this being past interveners. I'd like to bring us back, if I might, to the public citizen case where we started, and I hope we will end, I hope. That really sets the standard for this court as to how to analyze whether an agency has abused or not abused its discretion in connection with the need for analysis, and there are really two components to that standard. The first is that there has to be a reasonably close connection, something the court said was akin to proximate cause under the legal definition, between the action that the agency is asked to implement and the alleged effect that comes from that. The case I'm trying to figure out with public citizens, that case involves what the president can authorize and what an administration can authorize. Right. That is something under administration. All right. In this case, you have a single agency, the Department of Energy, which has carved out this thing for Perkivy, which is within the Department of Energy, and it says we'll do this thing. Right. And that seems very different from the scenario we had in public citizen, and how does this modeling and this splitting, how is that conformed to or how is that consistent with the rules against segmentation of activities underneath them? By an agency, you can't segment things and just sort of destroy the, look at it piece by piece and never see an environmental consequence. Well, of course, they haven't raised that issue in this case, but in terms of this. I'm asking you how. Yeah, I understand what you're saying. Public citizen, I can't import it here if it's going to create segmentation problems that just were not an issue between the president and the administration. Right. It doesn't, and let me just start with some of your questioning from before, and that is with respect to free trade nations, it's automatic. It's non-discretionary. Congress has made the determination in the statute that exports shall be allowed to free trade nations. So what's your thought? Right. MEPA does not. I'm sorry to be rude. Does that mean MEPA just doesn't apply or that it's supposed to be leveraged into the construction issue? That's what I'm trying to figure out. It doesn't apply to the effects that Sierra Club is alleging here because it's the same in my view as public citizen there where it was a non-discretionary determination. The agency there had authority over safety regulations. It did not have authority to stop the trucks from coming in. So too here. FERC, we have an order, a free trade order, authorizing the entire capacity to be exported. FERC, Sierra Club in the AUC is on page 16 of the reply brief. Their essential objection is that FERC should in essence not allow the spigot to be created and DOE should not allow it to be turned on. That's what these objections they're talking about here go to, and that is just like public citizen where there was a non-discretionary determination. The Supreme Court held that the safety agency there was not required to consider the alleged indirect effects of the Mexican trucks in this country under NEPA because Congress has declared that they will go. And in this case, Congress has declared that. But that's not the only issue. I think, am I correct that with respect to the Savine Pass facility, that DOE has already authorized export of gas to free trade? Free trade and non-free trade, Your Honor. But there are free trade. And is there any record basis for determining whether the increase in capacity is going to go to a free trade or a non-free trade? I'm just trying to figure out how many NEPA applies to this. There is not, Your Honor. And we have orders from DOE on the same capacity for both free trade and non-free trade. And there I would actually point out one thing that was seeming to trouble some of the judges here, and that is whether or not Sierra Club would have the opportunity to challenge some sort of a DOE order on non-free trade nations. Yes, they would have. There were orders from DOE issuing to non-free trade nations. Sierra Club didn't intervene in time on those orders and hasn't challenged them in court, but could have. There was an opportunity to do that, and the way that DOE regulations work is they don't do another environmental analysis. They did one already for the capacity that was authorized. They don't do another one for the non – just the thing that don't require new construction because the original one – Do you think Sierra Club has grounds to bring a petition against Department of Energy? They could have. They could have. They didn't. Okay. They didn't. They lost that opportunity. So that's why they're here. That's why we're here today. That's why we're here. And then I'd like to also – How does it work in terms of the practical matter if DOE is just piggybacking on FERC's need for analysis, right? That's my understanding. They sort of take their own independent look, but they don't do their own – They were a cooperating agency,  that was done for the – not this little slice of capacity, but the bigger slice of capacity. They were a cooperating agency. They participated in the NEPA process. Their concerns were presumably addressed because of the way the cooperating agency process works under NEPA. If an agency cooperates with the other agency and their concerns are addressed in the cooperation process, then when it comes back to them, they do have to make their own NEPA determination, but they can say, hey, our concerns were addressed. We are satisfied. And so DOE did that. But it keeps sounding like a heads, we win, tails, you lose, right? When they want to say – they say, hey, we need to factor in not just the environmental consequences of the construction, but the environmental consequences of what's going to happen after you build it, and that is the export and the increased production. And you say, oh, no, no, no, no, no. Raise that with DOE. That's their decision. And then when they try to raise it with them, they go, oh, no. We were a cooperating agency. We don't have anything more to decide. It can't be both, can it? First of all, they did have the opportunity to challenge DOE, but actually our position is and remains that whether it's FERC or whether it's DOE that is doing this analysis, NEPA only requires that they look at reasonably foreseeable impacts. I understand that, but your position is that you're not here to say whether or not someone might have prevailed. I know you wouldn't want to say, but might have been able to prevail. If they wanted to make the argument about it and didn't look at the export stuff, the FERC one was too narrow, then it should have been made when DOE said, hey, we're adopting that for our needs analysis. They could have challenged. That's the place to fight that. And, in fact, DOE made the exact same determination that FERC made here in that original environmental assessment when they adopted it. And someone could say, hey, you're way too narrow. You're supposed to look at all those export consequences that FERC said. It can't look at it or won't look at it. Yeah, and FERC made those objections. They just made them too late and they weren't able to challenge it. They had the opportunity, is all I'm saying. They had the opportunity to challenge those. Either way, though, either with regard to DOE or with regard to FERC, there still needs to be a reasonably close connection akin to legal proximate cause. And to follow up, Judge Griffith, on one of your questions, it is not sufficient here that they might be able to foresee that there's some level of natural gas production that might occur somewhere in North America at some point in the future. There are two different types of effects that they're saying that the agency had to consider. The first are, say, local regional effects. You do need to know where the gas is going to be produced. It could be produced anywhere from Canada to the Marcellus Shale in Pennsylvania to North Dakota to Texas. And the environmental impacts there are different. I don't think anybody could reason it. But they're capable of being discerned, right? I mean, there are models that show that. FERC said, and again, it is entitled to deference on these things. FERC said we can't. It's entitled to deference when it shows us it's used reason. Yes. Right, right, right. And its reason was, I think, quite reasonable. And it said that there's an interconnected national and, in fact, in some cases going to Canada, there's an interconnected pipeline system of natural gas such that the effects that Sierra Club is arguing here have never, in my knowledge, been deemed to be foreseeable under NEPA. And that is they're arguing price effects. They're saying that this additional capacity that you're authorizing here will have some effect on the price of natural gas, which will then have some effect on marginal producers who might produce more of it. Here's what I'm trying to get my head around. Here's what bothers me. I don't know if this is at a 30,000-foot level or right to the heart of the matter or somewhere in between. We all know that something very significant is happening in the country with this boom in natural gas production. It's a significant event that's taking place right before our eyes. Does it have environmental consequences? It's hard to imagine that it doesn't have environmental consequences. Who has to measure that and tell us, the public, what those costs are? That's what NEPA is supposed to do. That's what NEPA is supposed to do. All it's doing is informing decision-makers and the public what the environmental costs are. Now, who's going to tell the public the cost of this boom that's going on? There are multiple, multiple regulatory agencies that have that responsibility. EPA is one of them, and my understanding is it is currently looking at those exact issues. There are also state and local environmental agencies, say, in the places where it's produced, who do and should and will look at those environmental impacts. But NEPA is the statute that brings us here today. Right. And you're saying NEPA has no role to play in this decision-making process? No. I think it has a role to play with regard to the agencies that have that authority. So to bring the public citizen back into play, EPA has that authority. And you would say you wouldn't. Not DOE. It's DOE here when they allow increased exports. No, because DOE would only have to look at reasonably perceivable impacts. I'm talking about the agencies that are actually on the ground there looking at those impacts, and they do. It's like it's all trees and no forest. What's going on here? Right. DOE actually did say it was its job to look, but not under NEPA. We're here under NEPA. NEPA is not directed towards substantive policy choices. It's a procedural statute. DOE did look at those issues under its separate authority, which has not been delegated to FERC, to look at whether the export of the commodity to a non-free trade nation is in the public interest. So DOE did look at that. How do we know without a ZIPA analysis that in the process of looking at that, they factored in specifically these environmental consequences from the increased production, getting it out, moving it, and shipping it out? Because you can look, for example, at the order. Again, it's not the source. We're talking about DOE, but again, it's another case. But the final free port order has extensive analysis of that under DOE's public interest determination. But DOE said the same thing as FERC, and that is this is not a reasonably perceivable effect under NEPA. And to get to Judge Rogers' hypothetical about the tenants in the building, FERC and DOE both looked at the impacts from the 15 tenants in the building and how much traffic they would bring to the hallways and what they would do to the gardens and all that. And I know I'm not going to be, you know, I'm stretching the hypothetical a bit, but it would be sort of like saying in addition to doing that, you have to look at the impact from the electricity that the tenants are using and where that's going to be produced. And the agency said we will go this far because it's reasonable to do that. We are not going to go and look at the entire world, and that's what Sierra Club is asking, of course, to look at global impacts. And that's beyond regional. So you have to look at all of the factors that influence natural gas production, which include price, which include regulations by other agencies, which include technology. And on top of that, you would have to look at where the gas is going to be shipped, so what countries, and we don't even know that. My clients don't even know where it's going to go. And then you'd have to look at what it's going to substitute for in that other country, whether that fuel is going to be cleaner or dirtier than what the natural gas is. And all of that, you'd have to do a global economic analysis. Let's get that on the global analysis. I want to talk about regional or even national. Does the company, when it makes the decision to have this massive construction and expansion, and it's a huge amount of investment, does it not do its own internal studies and analysis on where we're most likely going to get this gas from? Not to my knowledge, Your Honor. They have pipelines. It would build all this and then go, oh, my gosh, there's no gas left for us. No, we build it all, and we know that it's connected to a pipeline so that people can get it to us. But how they get it to there is not of our concern, and we're not interested. But in terms of what we do and project, I would – So you don't have to have any contracts with anybody for supplies? We have contracts, but they can take the gas from anywhere they want. I know, but then once you have a contract with a company, do they not traditionally take it from different locations or can you not average? On average, they do it some from here, from this shale clay, and 50% of theirs last year came from this shale clay, 20% from another, and so we can figure these things out. I've got to figure. Your companies are very sophisticated in their modeling at some level. We're getting, obviously, beyond the record, but no, because the companies that we contract for the gas, they, of course, are taking it where the market on any particular day would allow them to do it, and markets change day to day. So they could take it from Pennsylvania today, and they could take it from Texas tomorrow, and they could take it from North Dakota on Thursday. But you know it's going to be there for you when you want it. We hope it will be there for us. Really, just a hope? There's a lot of money on hope. There's a lot of money, and I will just emphasize what Mr. Solomon said. There was a lot of money building these import terminals. We thought when we built these terminals, both the Sabine Pass and Freeport, that there was going to be a huge market for imports of natural gas. We put a lot of money behind that. It turned out it wasn't right. Now what we've done is we've hedged the market, so now these terminals are bidirectional. They can go either way depending on where the market is in any particular moment. Somebody can always tell you that they can put together a model that they can project. There are people out there who will tell you that they can project where the stock market is going to be 25 years from now based on some model. That may be okay for what they're saying, but it is not something that an agency would have to take account of under NEPA. NEPA requires under this public citizen that there be a reasonably close connection, something like proximate cause, and I don't think anybody could reasonably argue that this order authorizing the additional capacity for Sabine Pass export is the proximate cause of any particular environmental effect in North Dakota or Texas or the Marcellus Shale or globally. There are, in fact, numerous agencies who are looking at those effects. Do you have anyone standing? We haven't raised that or we haven't separately argued that issue, but I would say that it is Sierra Club's burden to demonstrate that they have standing. It is not our burden to disprove their standing, and they have put forward two pretty bare bones declarations, none of which says anything concrete about an injury that would occur from this additional slice of capacity, not something that they didn't challenge that happened before, and some interest of theirs. The issue and the problem on this is entirely of their own making. They intervened. They could have. They could have challenged the original order on capacity, and I don't think anybody would be arguing standing there because there was a big new facility that was being built, and it's going to have some impact. They didn't do that. So we're here today only because they chose, for whatever reasons, not to challenge that, and all they are challenging is this additional slice of capacity. It's their burden to show standing, and I think Burke has adequately demonstrated they have not carried that burden. I would just ‑‑ I think I'll be back here again, I think. We'll give you some time. Let's hear from petitioners in the Hayvon case. Thank you, Your Honor. I'll begin by addressing standing as being passed and time permits discussed for seeability and causation, but that may also carry over to the Freeport case. For standing, it's important to recognize that the standing inquiry and the NEPA inquiry are separate, and the two are separate in scope and there are different standards. First, NEPA analysis for the Sabine Pass expansion concluded that there would be no effects resulting from the expansion beyond the level of effects Burke previously authorized or the level of effects Burke previously considered, but that measurement of effects of the amendment against what Burke previously analyzed did not consider a counterfactual in which Burke took a no-action alternative and did not allow the facility to operate with the increases in efficiency in things that had been previously implemented and authorized, but where that efficiency was not used to actually increase the amount of gas exported. So, for example, Burke's analysis of vessel traffic is teared off of analysis they did for imports back in 2006 where Burke considered the ‑‑ 400 ships. 400 ships. And it's not going to be more than 400 ships now. Right. And so, Sierra Club is not challenging the adequacy of the NEPA analysis with regard to shipping traffic. For purposes of this appeal, our ‑‑ So the concern about increased shipping is out. No, because our member will be injured by the increase in shipping regardless of whether the increase in shipping was properly considered in the NEPA analysis. So, you know, member John Paul  because of the increase in shipping. What could change if this incremental increase in ‑‑ I mean, what you have to show is that the only thing that would happen if the NEPA claim prevails is that they'd have to go back and look at whether they should have increased the capacity. But those 400 ships can keep coming and going under the old capacity. But the record indicates that ‑‑ They can keep coming and going. The operations are exactly the same. And the record indicates that although for authorized 400 ships under the old capacity, the 400 ships would not actually visit the facility. How many were visiting the facility? 400 ships had never visited this facility. How many were? And what's the increase? I believe the facility is mostly idle since it was initially constructed. The export facility is not yet complete yet. We don't know what shipping cost will be there. But FERC estimated how many ships would be involved with the exports that were authorized in 2012.  he hasn't seen any vessels go by in the last couple of days? Not yet. He's concerned about a future impact as a result of that. But he has to be injured by this increased capacity. He can't say I'm injured by those 400 ships that you've already authorized in 2012, even if they aren't here yet. Right. And he is not. So in authorizing the export facility in 2012, FERC's environmental analysis considered two stages of the export process. We can come online half‑first and half‑second. And FERC provided in the environmental assessment, and we cite this in our reply brief, the number of ships that would be involved with the actual ship traffic rather than the level of ship traffic analyzed back in 2006. And FERC concluded that when you bring it halfway online, you'll get half the number of ships. When you bring it all the way online, you'll get something, I believe, with 200 or 250 ships per year for the level of exports authorized in 2012. So the record clearly indicates that in terms of actual shipping traffic, more gas means more boats. And so... Did you find a case for... Oh, yeah, for the aesthetic injury. Yeah, it's cited in our brief. It's Minnesota residents for environmental protection. There's 14 of our... But it's in our brief. And that stands for the proposition that a marginal decrease in happiness... Yeah, decrease in happiness. We're talking about they had noise concerns, they had visual concerns, it was in their backyards. But the visual concern isn't an aesthetic concern. Right, but my view for my property is now struck that I've got this turbine in the backyard. Well, our member, John Ball, enjoys being out on the river and in nature, and his enjoyment of the natural environment is diminished by having additional ships with large exclusion zones and noise interfering with his recreation. Those are already there from 2012. They're already authorized to be there. So the injury has to be that I'm fine with every boat being there that's authorized under 2012. It's just the X number of additional boats that 2014 has authorized. And since the X number of additional boats that 2014 has authorized is zero, I don't see how there can be an injury from that. You just say that we haven't started up yet. It takes time to get these things online. But the injury has to be from the legal action taken in 2014, and that didn't increase shipping. So the level of shipping is dependent on... There are only going to be as many boats as the facility can fill. And there's never been any indication that there would have been 400 boats per year. But they authorized up to 400 in 2012. They authorized that. They made that decision. If you thought the environmental consequences of 400 was bad, you're supposed to challenge that in 2012. But it wasn't challenged. So the NEPA analysis for up to 400, it's hunky-dory as far as we're concerned at this stage. And we are not challenging the NEPA analysis for the 400. And so then there's no... If you're not going to see 401 or 402, then you don't have an injury from increased shipping. So this court's opinion in Wilder Gardens v. Jewell clarified that the injury for purposes of standing does not need to overlap with the claim to deficiency in the NEPA analysis. I understand that, but you have to have a backup injury behind the procedure. And our asserted injury with regard to vessel traffic is that there will be... I don't have the numbers, but roughly 200 ships per year in terms of actual ship traffic under the 2012 authorization. But the 2014 authorization would cause there to be an additional 50 ships per year, a 25% increase. And so one extra day per week, there's going to be a ship on the river that's going to interfere with our members' enjoyment of the natural environment. And so that exposure to an extra ship actually on the river per year constitutes an aesthetic injury. In addition to vessel traffic, we have also asserted injury based on air pollution from increased operations of the facility. And again, this is an injury that is based on a change in actual operations rather than a claim based on the deficiency in the NEPA analysis. The FERC order authorizing the facility claims that the increase in output is possible in part by a decrease in downtime for maintenance. So the order explicitly contemplates that the facility will run more by using the reduction in maintenance downtime pursuant to the 2014 amendment. And that increase in operating hours will create an increase in actual air pollution emissions. And that actual increase injures our member regardless of whether the level of emissions that were previously analyzed. But FERC analyzed that increase and found that it did not have any actual impact. FERC concluded that the level of emissions would not exceed the level previously analyzed. FERC did not conclude that in terms of actual emissions, there would be no increase in result of the amendment versus the no action alternative. Had FERC said no to the amendment, there would be less... It's the same argument over again. They already have authorized and you can't trace any injury to them saying you can go up to this much in vehicle traffic, you can go to here in noise, and you can go to here in air. And after 2014, they're still not, they're going to the exact same places and you're saying, well, now I'm injured. And our view is that for Article 3, we are only required to show an increase in actual effects on our members and the scope of the authorization or the NEPA analysis is not determined. If our member will actually breathe more pollution because of this authorization than he would have otherwise breathed, that that's an injury sufficient for purposes of Article 3 standing separate from whether or not... It's not caused by this authorization. Well, it is caused by the authorization in a but-for causation of that increase in air pollution would not occur but for this authorization and that type of but-for causation is all that standing requires. I see that I've spent some time on just standing. I'm happy to answer any other questions in standing or discuss the additional issues during pre-court. All right, so we'll turn to pre-court. Okay. All right. Take a minute. I would appreciate that. All right.
judges: Rogers, Griffith, Millett